UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____
№ 14-CV-7280 (JFB)
_____

DOROTHY A. VIVERITO,

Plaintiff,

VERSUS

CAROLYN COLVIN, COMMISSIONER OF SOCIAL SECURITY,

Defendant.
_____

**MEMORANDUM AND ORDER**
February 25, 2016
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Dorothy A. Viverito ("plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the defendant, the Commissioner of Social Security ("defendant" or "Commissioner"), denying plaintiff's application for disability insurance benefits ("DIB"). An Administrative Law Judge ("ALJ") found that plaintiff had the residual capacity to perform the full range of sedentary work as defined by 20 C.F.R. § 404.1567(a) and was capable of performing past relevant work. Therefore, the ALJ determined that plaintiff was not disabled, and thus, was not entitled to benefits. The Appeals Council denied plaintiff's request for review.

The Commissioner has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff has opposed the Commissioner's motion and filed a cross motion for judgment on the pleadings, or in the alternative, remand, arguing that the ALJ erred by: (1) failing to fully develop the administrative record; and (2) failing to properly weigh the medical evidence.

For the reasons set forth herein, the Court denies the Commissioner's motion for judgment on the pleadings and plaintiff's cross-motion for judgment on the pleadings, but remands the case to the ALJ for further proceedings consistent with this Memorandum and Order. Remand is warranted because the ALJ clearly failed to properly weigh the opinion of the treating physician, Dr. Ruotolo.[1]

---

[1] As discussed, *infra*, on remand, in addition to evaluating Dr. Ruotolo's opinion according to the treating physician rule, the ALJ should also consider the new evidence submitted by Dr. Ruotolo and Dr. Dash.

## I. BACKGROUND

### A. Factual Background

The following summary of the relevant facts is based upon the Administrative Record ("AR") developed by the ALJ. A more exhaustive recitation of the facts is contained in the parties' submissions to the Court and is not repeated herein.

#### 1. Personal and Work History

Plaintiff was born on April 21, 1954, and was fifty-six years old at the time of the alleged disability onset date of March 20, 2011. (AR at 149.) Plaintiff is a high school graduate. (AR at 123.) She currently lives with her mother and sister. (AR at 28.)

Prior to March 20, 2011, plaintiff worked as an assistant supervisor in the Genovese Drugs corporate office from 1979 to 1999, and subsequently worked as a data entry clerk, accounts receivable clerk, and a collections clerk (all of which were described as "sedentary in exertional nature" by the ALJ). (AR at 20, 124.) Plaintiff has not worked since her alleged disability onset date. (AR at 122.)

On June 7, 2012, plaintiff completed a "Function Report," which detailed her daily activities, as well as how her condition affected her ability to perform various tasks. (AR at 132-40.) Plaintiff indicated that she was "limited in what [she] can lift due to [her] condition," "can not [sic] walk for a long period of time," has to "take [her] time and hold onto the rail" in order to climb stairs, "avoid[s] kneeling," was "limited in what [she] can reach for," "get[s] blurry vision [and] wear[s] glasses at night," and has "trouble reading." (AR at 137-38.) Plaintiff did not report that she had any difficulty standing, sitting, squatting, using her hands, or talking. (*Id.*) Plaintiff indicated that she could walk for "about 20 minutes" before she would have to stop and rest and that she would rest for "about 10 minutes" before she could continue walking. (AR at 139.) Plaintiff reported that she could not finish tasks that she started because she had to "stop and rest due to [her] condition" and that she could not follow spoken instructions because she had "trouble hearing," but that she could follow written instructions. (*Id.*)

Plaintiff reported that she goes outside daily, is able to drive, and can go out alone. (AR at 135-36.) Plaintiff goes shopping "about twice a week for about 30 minutes." (AR at 136.) Plaintiff reported that she prepares "light meals" daily and has no problem with personal care. (AR at 133-34.) Plaintiff is able to do "light household chores" and "light outdoor chores," though she reported that she needed help with some chores as well. (AR at 135.) Plaintiff's hobbies include "light gardening when able to" (though she "used to be able to garden without any limitation"), as well as watching television daily and going to the movies about once a month. (AR at 136-37.) Plaintiff indicated that her social activities are "limited" "due to [her] condition" but that she socializes with her family daily and goes to church once a week. (AR at 137.)

#### 2. Medical History

From June 16, 1998 through September 29, 2012, plaintiff was treated by Dr. Greg Dash, an otolaryngologist, for difficulties hearing. (AR at 232-42.)

On February 24, 2009, plaintiff saw Dr. Noah Kromholz for a thyroid consultation. (AR at 212-13.) Dr. Kromholz indicated that plaintiff had a history of autoimmune thyroid disease and a nodular thyroid gland, but was not taking any thyroid medication and reported that she felt fairly well. (AR at 212.) Dr. Kromholz noted that, upon questioning, plaintiff "admitted to weakness, dyspnea on exertion, and leg cramps" as

2

well as "episodes of weakness and sweating reportedly associated with low serum potassium levels." (*Id.*) After the examination, Dr. Kromholz assessed plaintiff as "clinically euthyroid at this time" and planned to "obtain repeat thyroid function studies to confirm her current metabolic status and a thyroid ultrasound examination to determine the stability of the nodularity." (AR at 213.) Dr. Kromholz also noted that plaintiff's episodic symptoms of weakness were "of particular interest" because they were "suggestive of thyrotoxicosis-associated periodic paralysis," but that unless plaintiff was thyrotoxic at the time of the weakness, such a rare diagnosis was unlikely. (*Id.*) A thyroid ultrasound was performed on plaintiff on March 23, 2009, and indicated that her thyroid nodule was "not discretely appreciated" and that an "underlying right thyroid abnormality [could] not be excluded in the region of focal heterogeneity." (AR at 214.)

On June 9, 2009, plaintiff was examined by Dr. Roger Kersten of Cardiology and Internal Medicine of Long Island ("CIMCLI") due to complaints of chest discomfort that had been "on and off for approximately 1 week." (AR at 294.) Plaintiff also complained of asthma that caused her to sneeze and have wheezing episodes when she cut the lawn. (*Id.*) Dr. Kersten noted that plaintiff had a positive nuclear stress test in addition to her chest discomfort, and thus, requested that she have an angiogram performed. (AR at 297.) Dr. Kersten also started plaintiff on Symbicort and Proventil for her asthma symptoms. (*Id.*)

On June 16, 2009, plaintiff was examined by Dr. Kevin Marzo, who performed a catheterization of plaintiff's heart, which revealed an anomalous left coronary artery that originated from the right coronary artery. (AR at 221, 223-24.) Plaintiff was referred for a CT angiography assessment performed at St. Francis Hospital on June 19, 2009, which confirmed the anomalous origin of the left coronary artery. (AR at 221.) Dr. Kersten reviewed plaintiff's test results with her on June 22, 2009, and indicated that the CT revealed "anomalous left main originating from the right coronary cusp" and that plaintiff would be having a surgical opinion with Dr. Schubach. (AR at 289.)

Plaintiff was then examined by Dr. Scott Schubach of Winthrop Cardiovascular & Thoracic Surgery, P.C. on June 24, 2009. (AR at 220-22.) Plaintiff reported "increasing dyspnea on exertion" and "occasional chest pressure" when walking stairs. (AR at 221.) Dr. Schubach noted that plaintiff appeared to have nonobstructive coronary disease on the catheterization and CT angiogram. (AR at 222.) Dr. Schubach indicated that plaintiff might benefit from coronary artery bypass grafting, but that her symptoms were "somewhat compelling as angina." (*Id.*) Dr. Schubach intended to review plaintiff's films further with Dr. Marzo and "possibly obtain a stress test to assess for any ischemia or reproducibility of the symptoms." (*Id.*) On July 1, 2009, a carotid ultrasound report was performed on plaintiff, which revealed "mild intimal thickening with no plaques visualized" for both the left and right carotid arteries. (AR at 288.)

On July 6, 2009, Dr. Schubach performed coronary artery bypass grafting for the anomalous left coronary artery. (AR at 218-19.) Dr. Schubach reported that plaintiff's "postoperative course was uneventful" and that she was being discharged in satisfactory condition. She is ambulating; she is in normal sinus rhythm and is neurologically intact." (AR at 216.) On July 30, 2009, Dr. Schubach examined the plaintiff again and indicated that she had

"done quite well and has no recurrence of her angina." (AR at 215.) Dr. Schubach noted that plaintiff had "mild cellulitis of her right leg saphenous vein harvest site, which was treated with antibiotics and has now resolved." (*Id.*) Dr. Schubach authorized plaintiff to "return to full activity without restriction from the surgical standpoint" and noted that he did not need to see her again unless further problems arose. (*Id.*)

On August, 20, 2009, Dr. Thomas Joseph, Dr. Kersten's colleague at CIMCLI, performed an echocardiogram on plaintiff. (AR at 286-87.) Dr. Joseph recommended "[a]gressive medical therapy and risk factor modification." (AR at 287.) Dr. Joseph noted that plaintiff "did not reach target heart rate which reduces the sensitivity of ischemic evaluation." (*Id.*)

On February 18, 2010, plaintiff underwent a CT scan of her neck, which revealed "minimal asymmetrical enlargement of the right submandibular gland and minimal prominence of the intraglandular ducts" which "together with the clinical history of pain and swelling in this region raise the possibility of resolving right submandibular gland sialadenitis." (AR at 331.) Evaluation of the rest of plaintiff's neck was "unremarkable." (*Id.*)

On May 6, 2010, plaintiff underwent an MRI of her brain, which revealed "[s]cattered foci of elevated signal intensity within the periventricular and subcortical white matter on FLAIR images [which] likely represent microvascular ischemic change in a patient with cardiac disease." (AR at 225.) "Clinical correlation to exclude other demyelinating or infectious/inflammatory processes [was] recommended." (*Id.*)

On March 31, 2011, plaintiff was referred by Dr. Pushpaben Parikh to Dr. Hebert Pasternak for a gastroenterology consult because she had been complaining of abdominal pain and bloating that had lasted for ten days. (AR at 184.) Dr. Pasternak recommended a CT of her abdomen/pelvis and an esophagogastroduodenoscopy ("EGD"). (AR at 185.) On April 4, 2011, plaintiff's EGD revealed hiatal hernia, erosive esophagitis, and gastritis, without mention of hemorrhage. (AR at 175.) The recommended plan was a diet and antireflux regimen, and "follow up in GI office for pathology results in 2 weeks." (*Id.*) At plaintiff's April 12, 2011 follow-up appointment with Dr. Pasternak, she reported that her pain was palated by a proton pump inhibitor ("PPI"), but that she was dissatisfied with her current treatments; Dr. Pasternak prescribed a higher dose of Nexium. (AR at 182-83.) Plaintiff saw Dr. Pasternak for another follow-up on July 14, 2011, at which he noted that plaintiff was successfully weaned off of using the PPI twice daily and was down to using it once daily. (AR at 180.) Dr. Paternak discontinued plaintiff's Nexium prescription and prescribed Zantac to be taken daily at bedtime. (*Id.*)

On December 8, 2011, plaintiff saw Dr. Tej Singh, a neurologist, complaining of headaches. (AR at 283-85.) Dr. Singh noted that plaintiff had "hearing loss in the Right more than the Left ear, with tenderness over the Right Occiput and a positive Sperling's Maneuver. Her exam, otherwise is non-focal." (AR at 284.) Dr. Singh believed that plaintiff was having Occipital Neuralgia, but recommended "MR Imaging" to rule out secondary causes for the headaches and an electroencephalogram ("EEG") to rule out epileptic focus as a cause of the headaches. (AR at 285.)

Plaintiff's MRI/A of her brain revealed no acute lesion, the MRA of her neck revealed no stenosis, and the MRI of her

4

cervical spine revealed multilevel degenerative disk disease, without cord impingement, neural compression, or significant central spinal canal stenosis. (AR at 226, 280.) Her EEG was normal. (AR at 280.) Dr. Singh indicated that plaintiff appeared to be having occipital neuralgia, for which he prescribed a new medication, Savella. (*Id.*) Plaintiff continued to see Dr. Singh for follow-up appointments in March, May, and June 2012. (AR at 255-57, 273-78.) At the May 1, 2012 appointment, Dr. Singh noted that plaintiff reported that Savella had been "helping a lot," but that she could not tolerate higher doses due to stomach upset. (AR at 273.)

On March 7, 2012, plaintiff saw Dr. Pasternak for a gastroenterology consult after reporting two weeks of abdominal pain. (AR at 178.) Dr. Pasternak recommended a colonoscopy, which was performed on March 20, 2012, and which revealed nonspecific inflammation of the colon and internal hemorrhoids. (AR at 174, 178.)

On April 27, 2012, plaintiff saw her primary care doctor, Dr. Robert Kersten, for a follow-up appointment. (AR at 203-207.) Plaintiff reported that she experienced some numbness and tingling in the right side of her face at times, feeling her lip being pulled to the left, and some numbness and tingling in her right fingers. (AR at 203.) Plaintiff reported that these symptoms typically lasted less than fifteen minutes and resolved spontaneously, and that they did not cause weakness, dizziness, lightheadedness, or palpitations. (*Id.*) Dr. Kersten noted that plaintiff's headaches had "gotten considerably better since she has been treated with Savella although she has not been taking this on a continuous basis" and would likely discontinue the medication. (AR at 203, 206.) Dr. Kersten also noted that plaintiff reported leg swelling, more on her right lower leg where she had the venous graft harvested than the left, following the bypass surgery. (AR at 203.) Dr. Kersten noted that as to her congenital coronary artery anomaly, plaintiff had no recent chest discomfort and would continue current medications. (AR at 206.) As to plaintiff's paresthesia, Dr. Kersten spoke with Dr. Singh and determined that a transcranial Doppler with emboli detection as well as an MRA of her brain would be performed. (*Id.*)

On May 4, 2012, an MRI of plaintiff's brain, with and without contrast, was performed. (AR at 163.) The MRI revealed "scattered foci of T2 hyperintensity in the central pontine and supratentorial white matter." (*Id.*) Dr. Craig Sherman, the interpretive physician, noted that these findings were "rather nonspecific" and "may be related to chronic ischemic disease, but other etiologies such as inflammation, vasculopathy, or even primary demyelination cannot be entirely excluded." (*Id.*) Dr. Sherman reported that the examination was "otherwise unremarkable." (*Id.*)

On May 9, 2012, plaintiff underwent a transcranial Doppler study, which was found to be "within normal velocity ranges," and no emboli were detected. (AR at 266.) On May 23, 2012, a brainstem auditory evoked potential study was performed on plaintiff, which evoked a normal response. (AR at 265.)

On May 26, 2012, plaintiff saw Dr. Paul Ricco of CIMCLI for a blood pressure check. (AR at 167-70.) Plaintiff also reported that she slipped and fell five days before the appointment, and struck her right elbow and side. (AR at 167.) Plaintiff denied shortness of breath, head or neck trauma, and chest, abdominal, or back pain. (*Id.*) Dr. Ricco's assessment of her pre-existing conditions – asthma, hypertension, and

mixed hyperlipidemia – were unchanged. (AR at 169.) Due to her fall, Dr. Ricco referred plaintiff for a chest X-ray, right rib X-ray, right elbow X-ray, and abdominal sonogram. (AR at 170.) Plaintiff's X-rays and sonogram also occurred on May 26, 2012. (AR at 171-73.) Her abdominal sonogram was "unremarkable," and her chest with right rib X-ray and right elbow X-ray revealed no evidence of fracture. (*Id.*)

On June 11, 2012, plaintiff was consultatively examined by Dr. Joyce Graber at the request of the Social Security Administration. (AR at 186-89.) Plaintiff reported that she had a double bypass in 2009, had suffered from hearing loss for the past eight years, and had reflux disease for many years, which caused her to develop laryngitis so that it was difficult for her to speak. (AR at 186.) Plaintiff reported that she had neck pain for the previous few months due to a degenerative disk disease. (*Id.*) Plaintiff noted that her pain varied but could be an 8 on a scale of 1 to 10. (*Id.*) Plaintiff further reported that she had fibromyalgia for ten years, Epstein Barr for eight years, sciatic back pain for five years, and osteoporosis for eight years. (*Id.*) Plaintiff also reported that she had cataracts developing in both eyes, which she was informed of six months previously, swelling of the veins in her legs for many years, and asthma for ten years. (*Id.*) Plaintiff also told Dr. Graber of the recent onset of numbness on the right side of her face and lower lip, and a pulling sensation on the right side of her lip. (*Id.*) Plaintiff also indicated that she was told that she had hardening in the arteries of her head. (*Id.*) Plaintiff denied that she had chest pain and reported that she could walk fifteen to twenty minutes outside if the surface was flat. (*Id.*) Plaintiff denied any history of high blood pressure, diabetes, heart attack, emphysema, or seizure disorder. (AR at 187.)

Dr. Graber noted that plaintiff was hospitalized in 2001 at Brunswick Hospital for pneumonia, in 1999 at Massapequa Hospital for pneumonia, kidney, and bladder problems, in 2000 at Brunswick Hospital for a fibroid tumor, in 2006 at Plainview Hospital for a cholecystectomy, in 2007 at Good Samaritan Hospital for low potassium, and in 2009 at Winthrop Hospital for a double bypass surgery. (AR at 186-87.)

Dr. Graber's examination of the plaintiff indicated that she had 20/25 vision, that plaintiff appeared to be in "no acute distress" as to her general appearance, gait, and station, and did not require assistive devices or help changing for the exam or getting off or on the exam table. (AR at 187.) Dr. Graber noted that plaintiff's cervical spine showed "full flexion but limited extension to about 30 degrees." (AR at 188.) No motor or sensory deficit was noted. (*Id.*) Dr. Graber found plaintiff's skin and lymph nodes, eyes, ears, abdomen, chest, and lungs to be normal, and that she had intact hand and finger dexterity. (AR at 188-89.)

Dr. Graber's diagnoses were (1) double bypass by history; (2) hearing loss by history; (3) reflux by history; (4) neck pain by history; (5) fibromyalgia by history; (6) Epstein Barr by history; (7) sciatic back pain by history; (8) osteoporosis by history; (9) cataracts by history; (10) vein swelling in her legs by history; (11) numbness on right side of face by history; and (12) asthma by history. (AR at 189.) Dr. Graber's opinion was that plaintiff's prognosis was "fair" and that she needed to "avoid activities requiring moderate or greater exertion due to her history of heart disease" as well as "smoke, dust, and other known respiratory irritants due to her history of asthma." (*Id.*)

On July 25, 2012, Dr. Luis Alejo performed nerve condition studies on

plaintiff, which were consistent with lumbar radiculopathy. (AR at 228-31.)

On September 4, 2012, plaintiff saw Dr. Aristide Burducea, an orthopedist, for an initial exam due to complaints of lower back pain and lower extremity pain, specifically in her right thigh and both calves. (AR at 328-30.) Plaintiff reported that the problem originated years ago as a result of an unknown trauma, and described the pain as sharp and stabbing and ranked her pain as a 10 out of 10. (AR at 328.) Plaintiff indicated that the pain was getting worse and that her symptoms were aggravated by walking. (*Id.*) Dr. Burducea's examination of plaintiff's back revealed paraspinal muscle spasms, and her lumbar sacral spine range of motion showed decreased forward flexion, extension, and lateral flexion. (AR at 329.) Dr. Burducea ordered continued physical therapy and right L4 and L5 transforaminal epidural steroid injections. (AR at 329-330.) Plaintiff refused any medications at the time. (AR at 330.)

Dr. Burducea administered transforaminal epidural injections at plaintiff's right L4 and L5 for therapeutic purposes on September 8, 2012, October 4, 2012, and October 17, 2012. (AR at 322-27.) On November 10, 2012, Dr. Burducea administered lumbar facet joint injections on plaintiff's side. (AR at 320-21.)

On October 15, 2012, Dr. Mary Lanette Rees, of the Dallas Disability Process Unit endorsed the July 26, 2012 assessment of A. Pestsoulakis, a disability analyst, that plaintiff had the residual functional capacity to perform light work. (AR at 202.) Dr. Rees noted that "based on the medical findings, claimant exams do[] not support the degree of limitations reported by claimant" and that the "evidence in the file does not support a fully favorable determination." (*Id.*)

On December 3, 2012, plaintiff saw Dr. Luis Alejo of CIMCLI complaining of persistent right knee pain and buckling. (AR at 243.) After examination, Dr. Alejo recommended an MRI to rule out meniscal or ligament injury, and noted that plaintiff would not tolerate physical therapy at the time. (AR at 245.) On December 8, 2012, plaintiff had an MRI of her right knee, which revealed "bone marrow edema in the patella which has a multipartite configuration, consistent with the presence of a fracture, possibly superimposed on a multipartite patella." (AR at 209.) Minimal displacement was present and there was associated bone marrow edema in the anterior aspect of the lateral femoral condyle and soft tissue edema in the anterior aspect of the knee. (AR at 209-10.) The MRI also revealed "[d]egeneration of the medical meniscus with suggestion for a small horizontal tear involving its posterior aspect" and tricompartment degenerative changes. (AR at 210.)

Plaintiff subsequently saw Dr. Charles Ruotolo and Maria Trotta, a physician's assistant, of Total Orthopedics & Sports Medicine for her right knee pain on December 14, 2012. (AR at 317-19.) Plaintiff reported that she fell on the sidewalk three weeks previously and landed directly on her knee, and that she had pain and swelling in the knee since then. (AR at 317.) Plaintiff assessed her knee pain as an 8 on a 1 to 10 scale. (*Id.*) Plaintiff was diagnosed with a closed patella fracture, prescribed a Bledsoe brace, and told to ice and rest as needed. (AR at 319.) At a follow-up appointment with Dr. Ruotolo and Ms. Trotta on January 11, 2013, plaintiff complained of weakness in her leg and intermittent "sharp, throbbing and burning pain" assessed at a 6 to 8 out of 10. (AR at 314.) The diagnosis remained the same, and plaintiff was recommended to start therapy for her knee. (AR at 315.) On January 21,

2013, Dr. Ruotolo and Ms. Trotta also signed a letter stating that plaintiff was under their active care for a closed fracture of her right patella and was "temporarily totally disabled and unable to work until repeat observation."[2] (AR at 211.)

On December 12, 2012, plaintiff returned to Dr. Pasternak with complaints of dyspepsia that started to exacerbate two months previously. (AR at 250.) Dr. Pasternak recommended another EGD, which was performed on December 17, 2012, and which revealed hiatus hernia, erosive esophagitis, and gastritis with mention of hemorrhage. (AR at 249, 251.) Dr. Pasternak recommended a diet and anti-reflux regimen, and prescribed a PPI. (AR at 249.) On January 10, 2013, plaintiff returned to Dr. Pasternak and reported no new abdominal pain since the endoscopy. (AR at 247.) Dr. Pasternak prescribed Omeprazole for twelve weeks with the plan to subsequently taper it. (AR at 248.)

Plaintiff had a follow-up appointment with Dr. Ruotolo and Ms. Trotta on February 1, 2013, at which plaintiff continued to complain of intermittent anterior knee pain and grinding, but rated the pain at a lower level of 4 out of 10. (AR at 311.) Plaintiff reported that she had been doing therapy on her own and was taking Tylenol for pain. (*Id.*) An X-ray of plaintiff's knee showed a healed patella fracture, and Dr. Ruotolo and Ms. Trotta recommended that plaintiff start taking glucosamine for pain and continue to do therapy at home. (AR at 312.) Plaintiff returned to Dr. Ruotolo and Ms. Trotta for a follow-up on March 5, 2013, and reported that the glucosamine "improved her pain tremendously." (AR at 308.) Plaintiff reported that her past night pain was resolved, but that she still had pain with kneeling and pressing on the knee cap, which she assessed at a 6 out of 10 and described as intermittent. (*Id.*) Dr. Ruotolo and Ms. Trotta directed plaintiff to continue to take Cosamin DS. (AR at 309.) At plaintiff's April 5, 2013 follow-up with Dr. Ruotolo and Ms. Trotta, plaintiff reported that she felt as if she had "reached a plateau in her pain improvement," and that she had pain with going up and down stairs and kneeling, which she assessed as a 6 out of 10 and described as intermittent. (AR at 305.) Dr. Ruotolo and Ms. Trotta indicated that plaintiff should return after authorization for viscosupplementation was obtained. (AR at 306.) On April 22, 2013, Dr. Ruotolo and Ms. Trotta injected plaintiff's right knee with supartz, and on April 29, 2013, they injected plaintiff's right knee with supartz a second time, and directed that she return in one week for a third injection. (AR at 299-304.)

On April 16, 2013, plaintiff saw Dr. Katherine Ann Carroll, a neurologist and colleague of Dr. Singh at Massapequa Neurologic PC, complaining of headaches. (AR at 252-54.) Plaintiff reported that she stopped taking Savella, which had helped with her headache pain, and in the past month, her symptoms returned. (AR at 252.) Plaintiff also complained of "episodes of right lower lip pulling to the side," numbness of the right lip, and intermittent right hand numbness and weakness at times. (*Id.*) Dr. Carroll noted that plaintiff had a history of occipital neuralgia, and was experiencing a return of previous symptoms of pulling of her lower lip and intermittent right hand numbness. (AR at 253.) Dr. Carroll noted that the "abnormalities on the

---
[2] The letter is actually dated January 21, 2012, but because plaintiff did not see Dr. Ruotolo and Ms. Trotta until December 2012 (and stated that her knee injury occurred shortly before that), it appears that the letter should have been dated January 21, 2013. Additionally, although Dr. Ruotolo's name is not printed below the second signature, the signature on the letter is consistent with his signatures on plaintiff's other medical records.

VER are not severe or convincing enough to justify an LP, etc. We will repeat the MRI Brain to re-evaluate this though." (*Id.*) Dr. Carroll also noted that plaintiff had hearing loss in the right more than left ear. (*Id.*)

3. Additional Medical Evidence Submitted to Appeals Council

As part of her appeal, plaintiff submitted Dr. Ruotolo's May 29, 2013 medical assessment of ability to do work related activities. (AR at 332-33.) Dr. Ruotolo indicated that he had treated plaintiff on a biweekly basis from December 14, 2013, through May 6, 2013. (AR at 332.) He wrote that plaintiff's lifting/carrying was affected by her impairment so that she could lift and/or carry 15-20 pounds "very little" in the day, and that her standing/walking was affected by the impairment so that she could stand and/or walk in total for three hours and without interruption for 30 minutes. (AR at 332-33.) Dr. Ruotolo further opined that plaintiff could climb very little up or down stairs, could not use ladders, could stoop very little, could never kneel on her right knee, could crouch very little, could never crawl, and that balance was not recommended on her right leg. (AR at 333.) Dr. Ruotolo indicated that reaching, feeling, speaking, handling, pushing/pulling, and hearing were unaffected by plaintiff's impairment. (*Id.*) On June 18, 2013, Dr. Ruotolo amended his assessment to indicate that plaintiff's sitting was affected by the impairment so that she could only stand for a maximum of three hours and sit for a maximum for two hours. (*Id.*)

Plaintiff also submitted a June 20, 2013 letter from Dr. Greg I. Dash, who indicated that plaintiff had "significant hearing loss in both ears," which resulted in difficulty hearing, especially when background noise is present; he recommended the use of hearing aids. (AR at 334.)

4. Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified before the ALJ on May 30, 2013. (AR at 27-30.) When asked why she stopped working, plaintiff testified that at the time she had heart surgery, her heart was bothering her, and that she had very bad acid reflux, which would cause her to lose her voice. (AR at 27.) Plaintiff began to say something about her hearing, but was interrupted by the ALJ who asked whether her conditions had improved, and she never finished her explanation.[3] (*Id.*)

B. Procedural History

On May 22, 2012, plaintiff applied for DIB, alleging disability since March 20, 2011. (AR at 109-10.) Plaintiff's claim was initially denied on July 26, 2012. (AR at 34, 38-45.) On August 24, 2012, plaintiff requested a hearing, (AR at 46-47), and on May 30, 2013, she and her attorney, Kenneth S. Beskin, appeared before ALJ Faraguna. (AR at 25-30.) The ALJ denied plaintiff's claim on June 11, 2013, finding that plaintiff "has not been under a disability within the meaning of the Social Security Act from March 20, 2011 through the date of this decision." (AR at 8-20.) The ALJ concluded that plaintiff had "the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a)," and that plaintiff was "capable of performing past relevant work as a data entry clerk, an accounts receivable clerk, and a collections clerk." (AR at 13, 19.)

---

[3] Plaintiff's counsel also briefly explained that plaintiff was initially prevented from working due to her heart disease and reflux, but that she had an orthopedic injury to her back, which became exacerbated at a later date. (AR at 29-30.) Plaintiff's counsel explained that in plaintiff's case, "the back kind of came in as a secondary condition but now adds to the overall condition." (AR at 30.)

9

On July 18, 2013, plaintiff requested review by the Appeals Council, which was denied on October 24, 2014, making the ALJ's decision the final decision of the Commissioner. (AR at 1-7.)

Plaintiff filed this action on December 15, 2014. The Commissioner served the administrative record and filed an answer on April 8, 2015, and filed her motion for judgment on the pleadings on July 23, 2015. Plaintiff filed her cross-motion for judgment on the pleadings and opposition to defendant's motion on August 25, 2015. Defendant filed her reply on September 9, 2015.

## II. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted); *see Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

## III. DISCUSSION

### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the

claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. Analysis

According to plaintiff, the ALJ erred in failing to fully develop the administrative record and in failing to properly weigh the medical evidence. As set forth below, the Court concludes that the ALJ failed to properly consider Dr. Ruotolo's opinion under the treating physician rule and remands on this basis.

1. The ALJ's Decision

Here, in concluding that plaintiff was not disabled under the SSA, the ALJ adhered to the five-step sequential analysis for evaluating applications for disability benefit. (AR at 11-20.)

a. Substantial Gainful Activity

At step one, the ALJ must determine whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial work activity is work activity that involves doing significant physical or mental activities," *id.* § 404.1572(a), and gainful work activity is work usually done for pay or profit, *id.* § 404.1572(b). Individuals who are employed are engaging in substantial gainful activity.

Here, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 20, 2011. (AR at 13.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

b. Severe Impairment

At step two, if the claimant is not employed, the ALJ determines whether the claimant has a "severe impairment" that limits her capacity to work. An impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c); *see also Perez*, 77 F.3d at 46.

Here, the ALJ found that plaintiff had the following severe impairments: degenerative disk disease of the cervical spine, lumbar radiculopathy, occipital neuralgia, and residuals of a right knee patella fracture. (AR at 13.) The ALJ found that, although plaintiff also had a congenital coronary artery anomaly status post coronary artery bypass graft surgery, sensorineural hearing loss, essential hypertension, hyperlipidemia, hemorrhoids, a hiatal hernia, and gastroesophageal reflux

11

disorder, there was "no evidence that these impairments significantly limit her ability to engage in work related activities." (*Id.*) The ALJ further found that, although plaintiff claimed that she suffered from Epstein-Barr, fibromyalgia, and a vision problem, there was no evidence that she had ever been diagnosed with those conditions. (*Id.*)

Plaintiff challenges the ALJ's determination that her hearing loss and gastrointestinal impairments were not severe impairments. As a threshold matter, the Court notes that the ALJ should have provided a more detailed explanation of his decision as to why plaintiff's other medical conditions did not constitute severe impairments. It is difficult to undertake meaningful review where there is only a conclusory sentence in support of the non-severe finding, which does not indicate the reasoning underlying the decision. However, the Court finds no reversible error with regard to the ALJ's assessment of plaintiff's impairments because the ALJ identified other severe impairments at step two of the analysis so that plaintiff's claim proceeded through the sequential evaluation process, and in those subsequent steps, the ALJ considered plaintiff's claims of hearing loss and gastrointestinal impairments in addition to her other impairments. *See O'Connell v. Colvin*, 558 F. App'x 63, 65 (2d Cir. 2014) (finding any error by ALJ in excluding knee injury as a severe impairment was harmless because ALJ identified other severe impairments and considered knee injury in subsequent steps); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding any error by ALJ in excluding claims of anxiety disorder and panic disorder from step two of analysis would be harmless because ALJ identified other severe impairments and specifically considered the claims of anxiety and panic attacks in subsequent steps); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir.

2010) (finding remand would not be warranted due to ALJ's failure to recognize disc herniation as a severe impairment because "the ALJ did identify severe impairments at step two, so that [plaintiff's] claim proceeded through the sequential evaluation process" and ALJ considered the "combination of impairments" and "all symptoms" in making determination).

c. Listed Impairments

At step three, if the claimant has a severe impairment, the ALJ next considers whether the claimant has an impairment that is listed within Appendix 1 of the regulations. When the claimant has such an impairment, the ALJ will find the claimant disabled without considering the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(d).

Here, the ALJ found that none of plaintiff's impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR at 13.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

d. Residual Function Capacity and Past Relevant Work

If the severe impairments do not meet or equal a listed impairment, the ALJ assesses the claimant's residual function capacity "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). The ALJ then determines at step four whether, based on the claimant's residual function capacity ("RFC"), the claimant can perform her past relevant work. *Id.* § 404.1520(f). When the claimant can perform her past relevant work, the ALJ will find that she is not disabled. *Id.*

In this case, the ALJ found that plaintiff had the "residual functional capacity to perform the full range of sedentary work as defined by 20 CFR 404.1567(a)." (AR at 13.) The ALJ concluded that plaintiff was capable of performing her past relevant work as a data entry clerk, accounts receivable clerk, and collections clerk because such work did not require the performance of work-related activities precluded by her residual functional capacity. (AR at 19.)

The ALJ noted that plaintiff alleged disability due to back, neck, and heart problems, hearing loss, fibromyalgia, Epstein-Barr, and acid reflex, and testified that she had migraines, blurry vision, and a hearing problem. (AR at 14.) The ALJ further noted that plaintiff indicated that she stopped working because "her heart was 'bothering' her, her reflux was very bad, and she lost her voice and could not speak." (*Id.*) The ALJ found that, although plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." (*Id.*)

The ALJ described plaintiff's medical history as stated in the record in great detail. (AR at 14-19.) The ALJ then found that, as for the opinion evidence submitted by plaintiff, "a physician's assistant is not an acceptable medical source" and "opinions regarding whether a claimant is 'disabled' are reserved to the Commissioner of the Social Security Administration."[4] (AR at 19.) The ALJ further noted that Trotta described the plaintiff as "temporarily disabled" and the record indicated that plaintiff's condition significantly improved in a relatively short period after her injury; thus, the ALJ determined that Trotta's opinion should be given little weight. (*Id.*) The ALJ also explained that he gave little weight to the state agency disability analyst's opinion because a "state disability analyst is not a professional and their [sic] opinions represent administrative findings rather than medical opinions." (*Id.*) The ALJ also determined that Dr. Rees' opinion should not be "given great weight" because she never had the opportunity to personally examine the plaintiff or review the medical evidence submitted after she submitted her opinion, and because her opinion was "not fully supported by the objective medical evidence." (*Id.*) Specifically, the ALJ noted that "it is reasonable to assume that the claimant would not be able to stand and walk for a total of six hours in an eight-hour workday due to her right knee impairment." (*Id.*) The ALJ further determined that Dr. Graber's opinion would not be "given great weight" because, although he personally examined the plaintiff, his opinion was "somewhat vague" and "not fully supported by the objective medical evidence." (*Id.*)

The ALJ articulated that his residual functional capacity assessment was "supported by the objective medical evidence" and plaintiff's testimony and statements regarding her daily activities. (*Id.*) Specifically, the ALJ noted that it was reasonable to assume that plaintiff would not be able to stand and walk for a prolonged period of time, or six hours in an eight-hour workday, due to her history of cardiac surgery, the residuals of her right knee injury, her cervical degenerative disc disease, and her lumbar radiculopathy. (*Id.*) However, the ALJ found that there was "no medical evidence such as reports of

---

[4] Though not entirely clear from the ALJ's opinion, it appears that this finding is in reference to the January 21, 2013 letter signed by Dr. Ruotolo and Ms. Trotta, which indicated that plaintiff was under their active care for a closed fracture of her right patella and was "temporarily totally disabled and unable to work until repeat observation." (AR at 211.)

13

wheezing, shortness of breath or hospital emergency room treatment that supports a finding that the claimant needs to avoid respiratory irritants." (*Id.*) The ALJ further noted that plaintiff did not state in her application or testimony that her impairments limited her ability to sit. (*Id.*) The ALJ detailed that plaintiff stated that she cooks on a daily basis, does light cleaning and laundry, shops twice a week, socializes with her friends, drives, does gardening and/or outdoor chores, goes to the movies once a month, and goes to church once a week, and reasoned that "[a]ctivities at this level are not consistent with an inability to perform any substantial gainful activity, but are consistent with an ability to perform sedentary work." (*Id.*)

Plaintiff challenges the ALJ's assessment of her residual functional capacity. For the reasons set forth *infra*, the Court finds that the ALJ failed to properly consider Dr. Ruotolo's medical opinion in making this determination.[5] Due to this error, remand is necessary because the Court cannot determine whether substantial evidence supports the ALJ's decision. *See Noutsis v. Colvin*, No. 14-CV-5294 (JFB), 2016 WL 552585, at *7 (E.D.N.Y. Feb. 10, 2016); *Branca v. Comm'r of Soc. Sec.*, No. 12-CV-643 (JFB), 2013 WL 5274310, at *11 (E.D.N.Y. Sept. 18, 2013).

---

[5] To the extent that plaintiff argues that the ALJ failed to consider all of her impairments in assessing her residual functional capacity, the Court disagrees. The ALJ noted, in detail, plaintiff's medical history and treatment, including that involving her occipital neuralgia, hearing loss, osteoarthritis, and gastrointestinal issues, (AR at 14-19), and indicated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence" in making his determination. (AR at 13.) Nonetheless, the Court finds that the ALJ's assessment of plaintiff's residual functional capacity still warrants remand due to the failure to follow the treating physician rule, as discussed *infra*.

e. Other Work

At step five, if the claimant is unable to perform her past relevant work, the ALJ determines whether the claimant is capable of adjusting to performing any other work. 20 C.F.R. § 404.1520(g). To support a finding that an individual is not disabled, the Commissioner has the burden of demonstrating that other jobs exist in significant numbers in the national economy that claimant can perform. *Id.* § 404.1560(c); *see, e.g.*, *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

In this case, the ALJ found that plaintiff was able to perform her past relevant work as a data entry clerk, an accounts receivable clerk, and a collections clerk. (AR at 19-20.) Therefore, the ALJ did not evaluate step five. (*Id.*)

2. Treating Physician Rule

Plaintiff argues, among other things, that the ALJ and Appeals Council failed to follow the treating physician rule because the ALJ dismissed Dr. Ruotolo's opinion, reasoning that Ms. Trotta was not an acceptable medical source. The Court agrees that the ALJ failed to apply the proper standard for evaluating the medical opinion of Dr. Ruotolo, and remands the case on this basis.

a. Legal Standard

The Commissioner must give special evidentiary weight to the opinion of a treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 78-

79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule, as set for in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).

Although treating physicians may share their opinions concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

When the Commissioner decides that the opinion of a treating physician should not be given controlling weight, she must "give good reasons in [the] notice of determination or decision for the weight [she] gives [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *see Perez v. Astrue*, No. 07-CV-958 (DLJ), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources.") (internal citation and quotation marks omitted). Specifically, "[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). "Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for a remand." *Snell*, 177 F.3d at 133.

"'Furthermore, the ALJ has the duty to recontact a treating physician for clarification if the treating physician's opinion is unclear.'" *Stokes v. Comm'r of Soc. Sec.*, No. 10-CV-0278 (JFB), 2012 WL 1067660, at *11 (E.D.N.Y. Mar. 29, 2012)

(quoting *Ellett v. Comm'r of Soc. Sec.*, No. 1:06-CV-1079 (FJS), 2011 WL 1204921, at *7 (N.D.N.Y. Mar. 29, 2011)); *see also Calzada v. Astrue*, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician."); *Mitchell v. Astrue*, No. 07-CV-285 (JSR), 2009 WL 3096717, at *17 (S.D.N.Y. Sept. 28, 2009) ("If the opinion of a treating physician is not adequate, the ALJ must 'recontact' the treating physician for clarification." (citing 20 C.F.R. §§ 404.1512(e), 416.912(e))). Such an obligation is linked to the ALJ's affirmative duty to develop the record. *See Perez*, 77 F.3d at 47.

### b. Analysis

The Court finds that the ALJ failed to apply the proper standard for evaluating the opinion of Dr. Ruotolo, the treating physician who co-signed the January 21, 2013 letter with Ms. Trotta.

The Commissioner correctly notes that physicians' assistants are not considered an "acceptable medical source" to whom the treating physician rule applies. *See* 20 C.F.R. § 404.1513(a); *see also Genier v. Astrue*, 298 F. App'x 105, 108-09 (2d Cir. 2008) ("[M]any of the key medical opinions cited during the benefits period at issue were those of a physician's assistant and a nurse practitioner—and not a physician. As such, the ALJ was free to discount the assessments accordingly in favor of the objective findings of other medical doctors. There was no treating physician error.") Instead, "nurse practitioners and physicians' assistants are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight." *Genier*, 298 F. App'x at 108 (citing 20 C.F.R. § 416.913(d)(1)).

However, "[w]hen a treating physician signs a report prepared by a nurse practitioner [or a physician's assistant] (an 'other source' whose opinions are not presumptively entitled to controlling weight), the report should be evaluated under the treating physician rule unless evidence indicates that the report does not reflect the doctor's views." *Djuzo v. Comm'r of Soc. Sec.*, No. 5:13-CV-272 (GLS/ESH), 2014 WL 5823104, at *4 (N.D.N.Y. Nov. 7, 2014); *Waters v. Astrue*, No. 5:10-CV-110 (CR), 2011 WL 1884002, at *8, n.5 (D. Vt. May 17, 2011) ("Cases have held that when a doctor and a physician's assistant sign the same reports, 'the opinions [are] those of [the treating physician] as well as those of [the physician's assistant.]'") (alteration in original) (quoting *Riechl v. Barnhart*, No. 02-CV-6169 (CJS), 2003 WL 21730126, at *11 (W.D.N.Y. June 3, 2003)). Courts that have dealt with the issue of a failure to apply the treating physician rule to statements signed by a doctor as well as a physician's assistant or nurse practitioner have consistently remanded for a new hearing. *See, e.g.*, *Riechl*, 2003 WL 21730126, at *11 (remanding where ALJ indicated he was giving less weight to doctor's opinions than he otherwise would because he believed the opinions set forth under doctor's signature were essentially those of the physician's assistant even though both doctor and physician's assistant signed the statements); *Djuzo*, 2014 WL 5823104, at *4 (remanding case where appeals council failed to evaluate report prepared by a nurse practitioner and co-signed by a doctor under the treating physician rule). Further, if an ALJ has any doubts as to whether an opinion signed by both a doctor and a physician's assistant is the opinion of the doctor, he should

"develop[ ] the record by seeking clarification" from the doctor. *Riechl*, 2003 WL 21730126, at *11.

The Court finds that the ALJ failed to apply the proper standard for evaluating the opinion of Dr. Ruotolo because he only attributed the January 21, 2013 letter to Ms. Trotta, who he found was "not an acceptable medical source." (AR at 19.) Because the letter was signed by Dr. Ruotolo, who is unequivocally an acceptable medical source, in addition to Ms. Trotta, the ALJ erred in failing to evaluate it under the treating physician rule. Because the ALJ failed to address the factors set out in 20 C.F.R. § 404.1527(d)(2) with respect to the January 23, 2013 letter, a remand is necessary.

Further, to the extent that the Commissioner argues that the ALJ was correct in not assigning significant weight to the January 21, 2013 letter because it was conclusory and unsupported by medical evidence, the ALJ has a duty to recontact the treating physician for clarification if the treating physician's opinion is unclear. Thus, to the extent that the ALJ believed that the letter lacked medical evidence to support its conclusion that plaintiff was disabled, he should have contacted the physician for clarification. *See Stokes*, 2012 WL 1067660, at *11; *Mitchell*, 2009 WL 3096717, at *17. Additionally, although the Commissioner argues that the January 21, 2013 letter was totally inconsistent with the record overall and that Dr. Ruotolo and Ms. Trotta's subsequent treatment notes demonstrate that plaintiff was healed in four months, the record does not bear that out. Although the medical records from her February 1, 2013 appointment indicate that plaintiff's fracture had healed and she reported that her pain level had gone down to a 4 out of 10, at her March 5, 2013 and April 5, 2013 appointments, she assessed her pain at a 6 and still reported pain while kneeling, pressing on her knee cap, and going up and down stairs. (AR at 305-12.) Further, she was subsequently treated with supartz injections for her knee. (AR at 299-304.) Thus, the Court disagrees with the Commissioner's assertion that the January 21, 2013 opinion was totally inconsistent with the record overall such that the result would have been the same had the ALJ considered the letter under the treating physician rule. Further, none of these points articulated by the Commissioner were made by the ALJ; rather, the defendant is assuming that these were the factors that the ALJ had in mind in refusing to give Dr. Ruotolo's opinion controlling weight. Such assumptions are insufficient as a matter of law to bolster the ALJ's decision. *See Newbury v. Astrue*, 321 F. App'x 16, 18 (2d Cir. 2009) ("A reviewing court 'may not accept appellate counsel's post hoc rationalizations for agency action.'" (quoting *Snell*, 177 F.3d at 134)).

Thus, in light of the ALJ's attribution of the January 21, 2013 letter to Ms. Trotta alone, the Court concludes that a remand is necessary so that the ALJ can consider Dr. Ruotolo's opinion under the treating physician rule.[6] Given the failure to properly

---

[6] Plaintiff also argues that the Appeals Council failed to consider new and material evidence (namely, the May 29, 2013 medical assessment of Dr. Ruotolo and June 20, 2013 letter from Dr. Dash). The Appeals Council indicated that it received additional evidence consisting of a "Representative Brief," "Physical RFC Assessment from Dr. Ruotolo dated 5/19/2013," and "Medical Statement from Dr. Dash dated 6/20/2013," which it made a part of the record. (AR at 5.) In the Appeals Council's denial of plaintiff's request for review, the Appeals Council stated that it considered "the additional evidence listed on the enclosed Order of Appeals Council" in making its determination that the ALJ's decision was not "contrary to the weight of the evidence currently of record." (AR at 1-2.) This was insufficient and constitutes a further ground for remand. *See Glessing v. Comm'r of Soc. Sec.*, No. 13-CV-1254 (BMC), 2014 WL 1599944, at *14 (E.D.N.Y. Apr. 21, 2014)

apply the treating physician rule, remand is appropriate for such a determination.[7]

Moreover, as noted above, on remand, the ALJ also shall consider the new evidence presented to the Appeals Council and allow the plaintiff to supplement her testimony, if she wishes, at the hearing.

IV. CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's cross-motion for judgment on the pleadings is denied, but plaintiff's motion to remand is granted. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:   February 25, 2016
         Central Islip, NY

***

Plaintiff is represented by John W. DeHann of The DeHann Law Firm P.C., 300 Rabro Drive East, Suite 101, Hauppauge, NY 11788. The Commissioner is represented by Robert L. Capers, United States Attorney, Eastern District of New York, by Vincent Lipari, 610 Federal Plaza, Central Islip, NY 11722.

---

(finding remand warranted where Appeals Council listed physician's letter among additional evidence received and made part of the record, but merely stated that the newly submitted information did "not provide a basis for changing the Administrative Law Judge's decision."); *see also James v. Comm'r of Soc. Sec.*, No. 06-CV-6108 (DLI/VVP), 2009 WL 2496485, at *11 (E.D.N.Y. Aug. 14, 2009); *Toth v. Colvin*, No. 5:12-CV-1532 (NAM/VEB), 2014 WL 421381, at *6 (N.D.N.Y. Feb. 4, 2014). "[W]here newly submitted evidence consists of findings made by a claimant's treating physician, the treating physician rule applies, and the Appeals Council must good give reasons for the weight accorded to a treating source's medical opinion." *James*, 2009 WL 2496485, at *10. Contrary to defendant's argument that detailed analysis is not required in denial notices issued by the Appeals Council, the treating physician rule nonetheless applies and requires that good reason be provided for disregarding a treating physician's opinion. *See Glessing*, 2014 WL 1599944, at *14 (remanding for failure to provide rationale for disregarding newly submitted evidence of treating physician's opinion in Appeals Council's denial of request for review); *Toth*, 2014 WL 421381, at *6 (same). Thus, on remand, the ALJ should also consider Dr. Ruotolo's report and Dr. Dash's letter, and evaluate them in accordance with the treating physician rule.

[7] Plaintiff also argues that the ALJ failed to fully develop the administrative record. Plaintiff is correct that it is well-established that the ALJ must "'affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding'" *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir. 1999) (quoting *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996)), and that the ALJ's regulatory obligation to develop the administrative record exists even when the claimant is represented by counsel or by a paralegal at the hearing, *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999); *Pratts,* 94 F.3d at 37. As noted *supra*, the ALJ interrupted plaintiff in the middle of her explanation of why she stopped working, (AR at 27), and the hearing transcript consists of a total of four pages. Thus, the Court has some concern that plaintiff had additional testimony to offer with respect to her medical condition and the impact of that condition on her daily activities. In an abundance of caution, and in light of the remand with respect to the need to properly apply the treating physician rule and to consider the new evidence presented to the Appeals Council, the Court also directs that the ALJ allow plaintiff to supplement her previous testimony with respect to plaintiff's medical condition, symptoms, and the impact of her condition on her daily activities.